We have two appeals to rehear en banc this morning. We will not take a recess after the first appeal is heard. We will give our colleague, Judge Choflat, a little time to leave the bench between the first and the second cases, but counsel, for the second case, you can just hold off on a moment while we get ready for the second case and then we will get started. Our first appeal this morning is HM Florida-ORL, LLC v. the Secretary of the Florida Department of Business and Professional Regulation. Counsel, we are familiar with your briefs, the authorities cited in your briefs, at least portions of the record. You have limited time this morning, so feel free to get straight to the heart of your argument. We are probably going to have some questions, but do be mindful of our traffic lights. As our former Chief Larry Edmondson once said, or said many times, please do not treat the red light as aspirational. When it shines, it is time to wrap up. But if you are finishing an answer to a question from the court, of course, you can finish it. You will be on our time. So, Mr. Dewhurst, will you please come speak with us? May it please the Court, David Dewhurst on behalf of the Secretary and I am joined at counsel's table by Nathan Forrester and Casey Witte. The Protection of Children Act does precisely what it says. Unremarkably, it imposes a modest restriction on children's access to sexually explicit performances that would be obscene for them. Florida unquestionably has that power. The Act was drafted carefully to comply with Ginsburg, Miller, Webb, and every other precedent dealing with minor obscenity laws. And just last year, the Supreme Court in Paxton upheld a very similar minor obscenity law. This Act doesn't violate the First Amendment and it's not vague. We ask the Court to reverse. Can I ask you a question really quickly just about what you mentioned vague. What's before us? What's properly before us? There's a vagueness strain of First Amendment doctrine, obviously a vagueness strain of 14th Amendment doctrine. Which of those two claims, either, both, is properly before us? Because as I read the complaint in the PI motion, the 14th Amendment is not in there. But you guys responded to it, sort of. The District Court adjudicated it, sort of. And in the briefs before us, everybody seems to have joined issue. So I guess question number one, is that question, the 14th Amendment void for vagueness question, properly before us? Your Honor, it's a little tough to actually make out in the verified complaint exactly what the claims are. But as you mentioned, there is a vagueness strain that runs through First Amendment doctrine. I think the panel sort of treated them together in some respects. And the District Court seemed to do that as well. We did decide to brief it because it does appear a pretty straightforward due process claim in the complaint. Although we admit that it does sort of meld together with some of the First Amendment arguments that are made. So we think it's important to at least address it. And how, if at all, do you think the First Amendment vagueness cases and the 14th Amendment void for vagueness cases differ? Well, we think that there could be a standalone vagueness claim completely divorced from a First Amendment claim. However, as we read the overbreadth cases, vagueness allegations often bleed into the sense of overbreadth or the sense of uncertainty about the stretch of a particular law and whether it applies to a plaintiff's activities. So first off, Your Honors, I'd like to start with standing. This is a pre-enforcement action and Hamburger Mary's actually bears the burden to show with evidence that it intended to engage in speech arguably prescribed by the Act and that it faces a substantial threat of enforcement under the Act. The only facts that were before the District Court that Hamburger Mary's put forward below are contained in its verified complaint. And the problem is they've effectively pleaded themselves out of standing in that complaint. So it's important to actually read through it and figure out what they say about their own performances. They say in paragraph 12 that they offer family-friendly drag performances where children are invited to attend. There is no lewd activity, sexually explicit shows, public exposure, obscene exhibition, or anything inappropriate for a child to see. This is a wholesome form of art and entertainment. Hamburger Mary point to the enforcement actions that Florida has taken against other drag shows that do not have lewd activities and saying, and then Hamburger Mary says, therefore, because we have a drag show, even though we don't think our behavior is lewd in those drag shows, why is that not a credible threat of enforcement against Hamburger Mary? Well, because none of the activity that they plead in their complaint is anything like the actual activity that was subject to those enforcement actions. Now again, in their complaint, they only mention the existence, the beginning of these investigations. In our response to the preliminary injunction below, we provided a declaration from the department along with the administrative complaints themselves and the supporting evidence. That's located at docket entry 121 and it's worth a read. They're helpful in the sense that they do in fact tell us what lewd conduct means and the activities that were subject to those actions would in fact be subject to the Protection of Children Act as well. I think that's right, but is there not an indication in the complaint, at least some indication, read in the light most favorable to them, as we must at this stage, that those other shows, the ones you're describing and the ones that they acknowledge happen, also were available to those of all ages? And I'm pointing specifically to paragraph 47 of the verified complaint, which says that since its opening in 2008, Hamburger Mary's has hosted drag-centric performances, comedy sketches, bingo trivia, and dancing. Traditionally, their performances have been open to all ages. What do we make of that allegation? Well, I think that's right. The word traditionally is clearly bearing some freight there, so it suggests that there might be other types of performances that Hamburger Mary's poses. I think the next paragraph is actually the only clear mention that we have of other types of drag shows. And this is what that says. It says, at such times as the entertainment is not suitable for children, children are not allowed to attend. And that's advertised beforehand. So they've pled themselves out of any type of injury. In fact, that's the only type of corrective behavior that the Protection of Children Act would actually require. Can you specify what the difference was in the performance of those undercover, whatever you want to call them, who witnessed behavior and said it didn't satisfy the prohibitions in the statute and nevertheless were prosecuted, as opposed to Hamburger Mary, who's saying the standing is based on that behavior by the state? What, indeed, was the difference between those prosecutions and what was happening, as opposed to Hamburger Mary's concerns? Well, I'm glad you asked, Judge Abuda. I'm happy to talk about what was actually occurring at those shows because I think it's important. One of the shows that was subject to an enforcement action featured a man with fully exposed buttocks, his G-string stuffed with dollar bills, leading around a three- to five-year-old girl by the hand. Well, let's talk about the one involving Jimbo. In that one, the performer was completely covered from head to toe, literally completely covered, and unzipped a zipper in his outfit and then pulled out a stack of bologna. And there was an enforcement action about that being lewd. What about that was lewd? Well, I don't think that was the only feature of that particular show, Judge Rosenbaum. That show also featured performers who forcibly penetrated audience members' mouths with their prosthetic breasts. They exposed prosthetic breasts and genitals to the audience, and they simulated masturbation by using their fingers to penetrate a prosthetic female genitalia. And I think, as any time we're looking at potentially obscene materials through the Miller test, we look at the entire performance as a whole. And so I think when you read through those complaints, it wasn't just one particular instance that's been peeled off that was subject to the state's action there. It was the sum total of that line. But that particular part, that's what there were photographs of in the evidence that the state submitted. Right. But if you actually read through, I'm sorry, Your Honor. The photographs that the state was contesting were photographs of Jimbo in his head-to-toe suit covered completely. Those were the photographs. Were they not? Those may have been the photographs that were attached to the administrative complaint. But again, I think you should read the administrative complaint. Why would you attach those if you didn't think that that was indicative of the lewd conduct? Those happened to be the pictures attached to the complaint, Your Honor. I mean, I think you actually have to read the rest of the complaint. So they were irrelevant. I didn't say they were irrelevant. I think that was an additional feature on top of the rest of the performance. So what is it about that that's lewd? Well, I think the graphic depiction about abortion, which essentially is what Jimbo was doing in that case, combined with all of the other acts in that performance. How is baloney abortion? You tell me, Your Honor. I'm unclear on that particular interpretation. Well, you're the state, though. That's your responsibility. No. Your Honor, you have to read the complaint as a whole. You cannot. It is contrary to the Miller test to pick out specific instances in these performances. These were judged as a whole to be lewd and lascivious. And that gets to the point about lewdness. Can you answer one question before you move on from standing? So one of the reasons, so these enforcement actions were under other laws. They were not under this law, right? That's correct. We finally lifted the injunction in part maybe, what, six months ago, something like that. Has this law been enforced at all since then? Not to my knowledge. There's been no enforcement actions under the Protection of Children Act. Can I ask you one more thing about standing? Yes, Your Honor. Weren't there allegations in the complaint about performances conducted on other days aside from the family-friendly days? As I mentioned— Can you discuss those? We don't have any details about those, Your Honor. I mean, all we have is what paragraph 48 suggests, that when they do have other shows that are not suitable for minors, then they don't let children attend. That's the lone fact that we have. But isn't that one of the issues in the complaint that they said, as a result of this act, we no longer allow children into the events? And like under paragraph 43, they simply cannot take the chance that their business or liquor license would be suspended for hosting a drag show where children attend. Yes, Your Honor. They definitely do say that in paragraph 49, which immediately follows paragraph 48, explaining that they already know how and always have complied with what this act would require. Didn't SCOTUS, in like the Susan B. Anthony list case, find that there was standing for Susan B. Anthony while the Sixth Circuit had held otherwise, saying that Susan B. Anthony said, look, we didn't lie under the statute? And isn't that what's happening here, that they're saying our drag shows don't fall within the statute, but it's prescribed conduct? Well, I think there are three responses to that. I think the substance of standing for a pre-enforcement plaintiff is to show that there's an objective chill. This Court has been perfectly clear about that, and the Supreme Court as well. It has to be an objective chill that they're feeling. And first off, the chill I don't think is even subjectively reasonable because they have admitted in their complaint that they already do the only thing that this act would require, which is to exclude children from obscene acts. Second, you have to look at the text of the statute and understand its scope, and then you decide whether the plaintiff's conduct that it has put forward is arguably prescribed by that law. Isn't one problem, though, with all of that, that as Judge Newsom was discussing, part of the allegations are that the terms of the statute are vague, and you might think that if you're not sure exactly what the statute says or exactly what it prescribes, and you think that Florida is likely to take a tough administrative stance, a tough enforcement stance, then your activity could be fairly chilled? I think that's a pretty good recitation of their argument. But again, I think it has to be an objective chill, and I find it hard to believe that the chill is objective when they disclaim in their complaint that any shows with children actually have lewd activity. They use the word in their complaint. They clearly understand what it means, and then they complain that the word lewd is vague. I've also alleged, though, that you have interpreted the exact same term, lewd, against, and I know you're going to say it's not against people who were not engaged in lewd acts, but we've already discussed the Jimbo situation. So they've already alleged that you have construed that word lewd in a way that differs from your own enforcement officers, and they've also alleged that they're subject to fines of $10,000 per offense plus a one-year jail term per child wrongfully admitted, and that it's not a defense to show that you checked the ID and it was false, if you could even have an ID for a child of a specific age. So why isn't that enough to show an objective chill? Well, for the reasons that I've said so far, and the one thing I will point out that you asked me this too related to that, sorry, but the House report on this itself, the staff House report, said that the direct economic impact on the private sector was venues hosting adult life performances or other types of performances may have decreased revenues relating to prohibiting such performances or discontinuing similar performances based on a fear or lack of understanding of the law or fear of violating the law. So didn't the staff of the legislature itself recognize that this was a potential problem with this law? Well, I think, Your Honor, that's one reason we've moved away from legislative history in recent years, and I'm unaware that a House staff report in legislation would automatically give standing to a plaintiff in an Article III sentence. No, but it does happen to show the reasonableness or the objectiveness of the chill. Not when you read their complaint, Your Honor. They can't say in one paragraph that we already do what this act requires, and in the next paragraph say, oh, but because of this act, we're canceling them all. Can I ask you just a question about chill? This may be the dumbest question in the world, but it's adjacent, I guess, to what we've been discussing. Chill is about self-censorship, fundamentally about self-censorship, and what self-censorship is there here? I mean, my understanding, at least from the verified complaint, and then the amended complaint, and then the corrections to the amended complaint, are that there haven't been any canceled shows. It might be excluding children, but the shows have gone on. Is that right? That's right, Your Honor. And is there, like, a separate First Amendment right of the speaker to have children in the  That's what I'm trying to figure out, if there's been any objective chill or self-censorship here at all. Absolutely not, Your Honor. On your first point, the way that the law operates, that's why it's important that we look to the text of the statute to see what its actual scope is. This doesn't prohibit a performance where a child is present. It says you can't have an adult live performance, you can't let a child in, you can't knowingly admit a child into an adult live performance. The show can still happen. It does nothing to stop any adult live performance for any adult. On your second point about speech rights, this Court was very clear in Webb that a state can deny minors all access in any form to materials obscene as to them, absent an impermissible burden on adults. And then the Supreme Court last year, Your Honor, said that no person, adult or child, has a First Amendment right to access speech that's obscene to minors without first submitting proof of age.  But doesn't it also mean that there are certain minors who would otherwise have the right to hear and see the speech who don't get that right to hear and see it? So, for example, because of your sliding scale, and we haven't even gotten into how you define what is obscene for the particular age of the minor, but let's just assume for purposes of this question that we could do that. Would you agree that what is obscene for a child of a younger age might differ from what is obscene for a child of 17 or 16? I think that's what the Act contemplates, Your Honor. Right. Okay. So if Hamburger Marys is not allowing anybody under the age of 18 into any of its performances because it fears that perhaps some of its speech might be obscene for a younger child, but not a child of 17 or 16 or whatever the case may be, aren't those children's First Amendment rights being violated? In other words, aren't those children not being able to obtain speech that they would otherwise be able to get? I see I'm running out, but it's okay if I answer. Yes. Yeah. So the reason that we have what you call the sliding scale, whatever you call it, the age variability standard, is to avoid some of the over-inclusivity problems that we've seen in other sort of harmful to minor statutes. You saw this particularly in the Ashcroft case that the Third Circuit decided and then the Supreme Court ultimately struck down the law in that case. Because while it was meant to protect kids from harm, it essentially acted as a speech ban on all adults. And what those cases have observed, those cases, others like Butler back in the 1950s, is that you don't necessarily want to burn the house to roast the pig. Sometimes you need to have a law that's tailored so that you can protect whatever First Amendment rights exist for near adults. And so that's exactly why our law is designed this way. But that's nonsensical. I mean, that's really nonsensical. And the reason it's nonsensical is because the sliding scale actually limits more speech than just a strict cutoff at 18 does. Wouldn't you agree with that? It could, Your Honor. It could in some instances protect a 5-year-old who's not being judged by the 17-year-old standard. That's correct. But in other instances, it could protect the 17-year-old who's not being judged by the 10-year-old standard. So it's intentionally designed in order to thread that needle to be more speech protective. One more quick response to your question, Judge Rosenbaum. But do you have any cases or authorities you would cite to support the notion that a law that cuts off more speech than a broader law is narrowly, is more narrowly tailored than the broader law? Well, the law can't cut off speech, Your Honor. It would only cut off speech that would be obscene for the child present. So it doesn't cut off more speech. It actually only opens the door for older minors to actually access some of the speech when it might not be obscene for them. It doesn't actually cut off any speech. Is it fair to say that this isn't a binary where this law cuts off more speech than a hard 17- or 18-year-old? It just, it's different. It allows different kinds of speech. And it may be that this law allows way more speech than the kind of standard that would just be at 18. That's exactly right. The Miller for minors test, which is well established and was reaffirmed by the Supreme Court last year, already calls on everyday citizens, prosecutors, and juries to make a determinant about what is obscene for a 17-year-old, but not an 18-year-old. And how do we define that? I think there are always tough line drawing questions, Your Honor. Give us any guidance. We would say, yeah, but that's also a feature of obscenity law, which the Supreme Court has recognized. Is it any harder to determine what would be appropriate for a 15-year-old versus a 16-year-old than determining what would be appropriate for a 17-year-old and an 18-year-old? I don't think so, Your Honor. But there's no problem with drawing the line at 18 years old, right? I don't think so. This is not, our law, the sliding scale is not a difference in kind from the Miller for minors test. It may be a small difference in degree. Can you provide us with any guidance whatsoever as to how we determine 16 versus 15 versus 14 versus 13 versus 12, et cetera? The Supreme Court has repeatedly refused to find any constitutional defect with the Miller for minors test. So you can't? All, no ma'am, all our law does is require you to make that same judgment within the class of minors. But tell us how to do it. That's all I'm asking. Can you tell us how to do it? Your Honor, we can complain about the Miller test. I'm not complaining about the Miller test. I'm asking you how you make the judgment with respect to one year versus another year. That's all I'm asking. Just, you can give us guidance on that. Because you're expecting, you're expecting all of, you're not only expecting commercial venues to be able to do this, but people at home if they want to have this kind of entertainment or whatever, you're expecting everybody to be able to draw this line. So just give us some general guidance. That same uncertainty that you seem to be highlighting is the exact same uncertainty that is well established and the Supreme Court has repeatedly said is just fine. States have the ability to do this. When has the Supreme Court ever said that it's fine with respect to year-by-year cutoffs? When they say that the Miller for minors test, this Court said it, yes, when? And that has said year-by-year? No, it said 17 versus 18. That's when it made that judgment. And so our law simply operates within the class of minors. Who makes the first decision about inappropriate for a 12-year-old, appropriate for a 17-year-old? In the first instance, it's the citizen, it's whoever's hosting the show. No, no, no.  Legally, it would be an enforcement authority, a prosecutor. Okay. And what review do you believe a court has over that enforcement authority once you, the state, makes the first decision? Well, I think the way that it normally works in any obscenity case is that ultimately it's for the trier of fact to determine, beyond a reasonable doubt, that particular speech is obscene. Okay. Mr. Drewhurst, you've been answering a lot of questions from the Court and you've saved some time for rebuttal. Let's hear from Ms. Stewart. Good morning. May it please the Court. My name is Melissa Stewart, counsel for Appellee Hamburger Marys. The Florida Act criminalizes disfavored speech across the state. The undefined terms and age-variable Miller Standard leave would-be speakers to guess at what the law prohibits. It applies anywhere and everywhere, even in the private homes of citizens. It gives no consideration to parental consent and it creates a strict liability offense with severe criminal penalties, including fines and jail time. Can I ask you a threshold question, a version of the question I asked your adversary? Do you agree with the state's contention that the record before us consists entirely of your verified complaint and the PI motion? This is an interlocutory appeal. I think it's different than an appeal from a final order. I don't think the Court is required to blind itself to ongoing developments at the district court. Well, so this is what we said in a case called Barber v. Governor. Because the initial complaint was the complaint that was before the district court when it determined whether the plaintiff's claim had a reasonable likelihood of success for purpose of the preliminary injunction. Like the district court, we focused on the allegations of the initial complaint rather than the allegations of the amended complaint. And I think that the verified complaint gets us to standing just fine, Your Honor. So are you willing to kind of drop all the references in your brief to document 56-1? I think if we drop all of those references, we still went on standing, yes, Your Honor. So all right. So last question from me, then I'll leave it alone for the moment. With respect to standing and self-censorship, are there allegations in the verified complaint of self-censorship? Yes. I mean, are there allegations that any shows were canceled, number one? No. What then was the self-censorship? It seems to me that the shows went on with a different audience. I think you said that with respect to a show on May 21st, you had to exclude the kids. Actually, I misspoke. Yes, there is an allegation in the verified complaint. I don't know the paragraph off the top of my head that the family-friendly shows, specifically the drag brunch shows, have been canceled. That's paragraph 49. The shows themselves were canceled? Yes. Paragraph 49, the family drag shows have been canceled. They cannot take place if the law is allowed to stand. The family drag shows were specifically geared toward young children. They were themed, like Disney themes, musical theater, and intended to be for young children. So yes, after the law passed, those shows were canceled. After the law passed, Hamburger Mary's made all of its shows 18+, it hired private security at its own expense, it started carting at the door, which it had never done before. But that's not in the verified complaint. That is not in the verified complaint. So I think the standard that we have to apply here, I just want to make sure I'm right, is that you are objectively, sort of reasonably objectively chilled, so it's not just that you subjectively did some stuff. So I understand your argument about lewd, that you think, okay, maybe these performances could meet someone's definition of lewd. But the Act goes on and says it also has to predominantly appeal to purient, shameful, or morbid interest. It has to be patently offensive to prevailing standards. And it has to be without serious literary, artistic, or scientific value. What allegations in the complaint suggest that someone could look at what's going on here and think that it meets those three elements of the statute? Two parts of the, I'm sorry, Your Honor, you want to know what parts of the verified complaint? Yeah. I mean, just, I don't see, I would like you to point me to something that suggests, you know, this is actually, these drag shows appealed to a purient interest, for example. Well, I think it's important to note that this Act passed, and Hamburger Mary's initially self-censored after the Secretary's enforcement actions against Paws Alive. And I think that— But that was another Act, though, right? That was— It was— This Act has never been enforced. It was another law. It was a much more narrowly drawn law. And even there, the Secretary sent in undercover agents to see that show, and her own investigators came back and said, there is nothing lewd or lascivious in this show. Right. And the Secretary went ahead after Paws Alive anyway. So the State's attorneys are here to tell you that Hamburger Mary shows do not— Can I just— So, and maybe I'm missing something, but that, I thought that was about lewd. And I understand your point there is that there's this other law that applies to lewd conduct that the State was out enforcing. But this law requires that it appeals to a purient interest. Was that an issue in the other law or not? I believe the other statute did also use an adapted Miller's—Miller for minors test, but it didn't use the age variable test. And importantly, Miller requires that the prohibitions in the statute be specifically defined. So the State cannot simply broadly prohibit or criminalize protected speech and then hide behind a savings clause like the Miller for minors standard and say it's okay because only if it passes the Miller for minors test. I think a good analogy there is if a State were to, say, criminalize any publication calling for a Christian nationalist government, but only if that publication meets the Brandenburg test for incitement. That law would still be unconstitutional. What Florida has done here is it has created a template whereby it's allowed to chill any kind of speech it doesn't like as long as it attaches it to a Miller for minors test. And the First Amendment protections are more robust than that. Can we go back to standing for a moment? So we're talking about arguable proscription and everyone's been talking about an objective chill, but it seems to me that the arguable part of that formulation has to refer to something other than just what is the objectively proper interpretation of the law. And can you tell me how to figure that out? It seems to me like it's basically a frivolity standard. So long as it's a non-frivolous interpretation that it would be arguably proscribed. Is that right or not? I would agree with that, Your Honor. I don't think arguably is a high standard, and I don't think a small business drastically changes its successful business plan to its own economic detriment for no reason unless it truly fears enforcement of the statute. Can I ask you one follow-up on my question about canceled shows? I take Judge Lagoa's point about paragraph 49, and now perhaps I'm violating my own, the premise of my own question about stuff outside the verified complaint in the PI motion. But do I have it right that in the amended complaint you corrected this allegation about canceled shows? No. You're standing by factually that shows were canceled. I'm saying that the Sunday drag brunch was canceled after the law passed, but before the preliminary injunction, yes. Okay. I just want to get the record straight. But even if shows aren't canceled, aren't there other harms? Yes. Absolutely, there are other harms. So this law chills speech in two ways. It chills the speech of minors, older minors who may have the right to access speech that a five-year-old may not. This law requires Hamburger Mary's to distill its shows to what is appropriate for the youngest person in the room. And it also chills the speech of parents who may or may not know what is and is not prohibited under this law, whether or not they can bring their children to a show. And it chills Hamburger Mary's speech because this is a strict liability crime. There is no way for Hamburger Mary's to be 100 percent sure that it is complying with this law. And Paxton is really instructive here. Paxton dealt with actual pornography, which everyone agrees is obscene for minors as a  The Texas statute essentially created a time, place, and manner restriction. It's a straightforward regime for compliance. You use one of these methods to verify ages of the people coming to your website. You comply with the law. The structure here suggests that the intent is to chill speech by making compliance as murky as possible. Hamburger Mary's can make every show 18 plus. It can make every show G-rated. It can card every single person at the door. And it still can't be sure that it's complying with this law because the law gives no guidance on what lewd conduct is or what lewd exhibition of prosthetic dress is. That doesn't sound right to me. If they restrict it to 18 and under, then they can't violate the law, right? The law specifically says that ignorance of a child's age or a child's misrepresentation of their age is not a defense. So if Hamburger Mary's cards every person at the door and a child gets in with a convincing fake ID, which are very easily accessible on the Internet these days, Hamburger Mary's can still be liable. There is no defense. There's no defense for a child who comes with a parent. But that's no different than if you're just dealing with an alcohol establishment and you have someone who shows up, you know, under 18 and they have a fake ID and they come in. I mean, you could also be violating the law by allowing somebody who's a minor, even though they have a fake ID. I'm actually pretty sure that Florida has a Florida's alcohol laws have a affirmative defense for a bona fide attempt. But is that a policy choice or a prescription of the United States Constitution? Well, so it may be true. I don't know the corpus of Florida law. It may be true that in Judge Lagoa's example, with respect to bars or whatever, there is a sort of a good faith defense in effect. But is that or I think your position has to be that the United States Constitution requires that good faith defense, at least when speech is at issue. I think that's close, Your Honor. I think our actual argument is that a defense, affirmative defense for age verification, for example, is one way in which this law could have been more narrowly tailored. And it's the State's burden to explain why that feature of the law is absolutely essential to their compelling interest. And the State can't do that here. But that's only true, though, if this doesn't just cover obscene conduct, right? If it covers obscene, then there's no First Amendment protection for obscene as to minors, right? The law on its face reaches beyond obscenity. It's a Miller-for-minors test, so we're automatically talking about speech that is protected for adults. And the age-variable Miller-for-minors test means that we're talking about speech that is protected for at least some minors. So yes. Doesn't the quasi-strict liability aspect of this also go to the standing because of the chilling effect? Yes, I think so. I think the fact that the law is not narrowly tailored certainly makes Hamburger Mary's self-censorship more reasonable. Could you just follow up and explain why you think that the law covers protected speech as to instead of obscene speech? Two reasons. First, the two undefined terms, lewd conduct and lewd exhibition of prosthetic genitals and breasts, are completely undefined. And the first four prohibitions in the statute are extremely specifically defined. They're preexisting in Florida law. And they cover the heartland of Miller. They cover the kind of hardcore sexual content that Miller contemplated. So unless those two terms are surplusage, they have to go beyond that. They have to reach speech that is protected, maybe sexually suggestive. Yes, sometimes laws contain surplusage, right? They do, Your Honor. Sometimes laws contain surplusage. But importantly, even if— And if that—sometimes Florida law does, right? So Florida has a statute that refers to obscene, lewd, lascivious, filthy, indecent, sadistic or masochistic material. And the state Supreme Court has said that that refers only to legally obscene material. Now, it's hard for me to understand how there could be a term that could be more exhaustive of obscenity than obscene. But that's the first word in that statute that they said only covers obscene. So don't we have to construe this in the way that the Florida Supreme Court would? And if we do, I don't see how we can say this is anything but surplusage. Or that this—it contains surplusage, and that's okay. So you could interpret it to contain surplusage, but that would not cure the statute of its constitutional maladies. I don't think that this statute is— I mean, I guess my question is, if we look at the decision, like the Stahl decision from the Florida Supreme Court, that's really what we are obliged to do here, isn't it? I don't think so. I think that decision is very similar to the decision in 12 200-foot reels, where the Supreme Court dropped that footnote and said we're willing to construe these terms, like the word lewd, as covering Miller's heartland. I don't think that that interpretation is available here, because those first four terms already cover, very specifically cover, everything at the heart of Miller. Can I ask you, just following up on this line of questioning, and again, maybe this is stupid, but even granting the premise, like let's assume that the lewd clauses do extend beyond Miller, why does that render the statute facially overbroad? I mean, it seems like you're going to have tons of valid applications of this statute, namely the Miller applications, and then, you know, sort of two clauses that might in your interpretation be invalid, but why would they substantially outweigh all the valid ones? I don't think it's just those two terms. I think that is certainly part of why this statute is overbroad, because I don't see a way to read this law as those two terms have to cover more, right? They have to cover something beyond obscenity. They have to cover something that is sexually suggestive, but still protected speech. But I think in concert with the age-variable Miller standard, with the lack of parental consent, with the strict liability offense, those aspects of the statute working together are what make this statute facially overbroad. Do you agree, just in terms of how overbreadth works, that in terms of, like, stacking up applications on the two sides of the ledger, that for the protected side of the speech is covered by the First Amendment? That is non-obscene, non-incitement, non-whatever. But it also has, like, run the scrutiny gauntlet. I mean, the Supreme Court basically said this in Hansen, right? The fact that speech is not categorically unprotected does not mean it's protected. It just means that it, you know, sort of is applicable to the requisite level of  So you can't make an overbreadth claim by simply saying, well, there's speech here that is categorically unprotected and some that's covered, and therefore it's overbroad, right? With respect to the covered piece, you've got to show that you kind of, like, win the scrutiny battle, right, such that the speech is actually not just covered, but protected. Yes. Okay. I just want to make sure. Yeah. Yeah. And I think that that is, I think that we've done that here. Look at the definitions for, for instance, lewd conduct proposed by the state. You know, they've pulled the Florida jury instructions, which use words like wicked or unchaste. Those descriptions are hopelessly vague and support the argument that even Hamburger Mary's family-friendly shows are arguably prescribed by this law. I mean, one of the Is it vague or is it equating a drag show with obscenity in and of itself? I mean, I think both. I think this law, the structure of the law does suggest that it's intended to kind of hang like a sort of Damocles over anyone in Florida doing a drag show. You know, I only know of two groups of people who frequently wear prosthetic breasts and it's people who've had mastectomies and drag performers. So I think it's pretty clear who this law was intended to target. Let me ask you a question just sort of theoretically about the overbreadth aspect of this. So you know, we talked about stacking up protected, protected speech versus unprotected or protected parts of the statute versus parts of the statute that are overbroad against each other. But wouldn't that be a way, I mean, if a state could, let's say a state, and I'm not saying this is what Florida did, but just theoretically, if a state decided that it wanted to survive an overbreadth challenge and outlaw speech that was protected, couldn't it just sort of tag that onto a statute that also outlawed speech that was clearly not protected and say, well, look, you know, we've overwhelmingly shown that the number of instances where the statute attacks speech that's not protected, you know, that overwhelmingly exceeds the number of instances where it attacks speech that is protected. I mean, don't we have to kind of look at more than just tagging on, you know, this unprotected speech coverage? I think that's right. I think you have to look at the practical applications of the law and not just the technical amount of speech. And I think, again, that's part of the insidious kind of template that Florida has created here where, you know, they've created this law that chills speech creates a strict liability of criminal offense for protected speech. And then they're kind of waving their hands and saying, oh, but only if it meets the Miller for minors standard and, you know, we're only focusing on, you know, extremely, you know, sexually explicit conduct. But that's not what the law says. The law doesn't limit itself to extremely specific conduct. Before – I'm almost out of time here, sir. Can I just get you on the lewd issue? So the state cites this case, Chessborough or Chessborough, that defines lewd for Florida law. I understand you've got one argument about that. You say basically, you know, we shouldn't incorporate that standard because it would be superfluous. But do you have an argument about what if we did incorporate that standard? Is the standard itself a problem? Do you mean the standard in Chessborough? Yes. I don't know that – I mean, the Florida Supreme Court in Chessborough, that was a very specific set of facts where an adult had performed actual sex in front of a 14-year-old. And the Florida Supreme Court had no problem saying, yes, that meets the definition of lewd under this act. I think even if you were to apply that to this law, this is – this law has so many constitutional infirmities. I don't think – Well, I guess I just want to just unlewd. The Florida Supreme Court said that lewd, at least in that statute, I understand your point about that, means, quote, an unlawful indulgence and lust, eager for sexual indulgence. Do you have a – is there any argument that if we incorporate that standard, that lewd still applies to something beyond just obscenity?  Yes, because this law regulates speech. And that law, to my understanding, was about actual – exhibiting actual sex in front of minors or exhibiting actual – actual obscenity in front of minors. And this law goes well beyond that. Okay. Can I ask one more question? Yeah. Just to follow up on that. So when I asked you earlier about – so your main pitch is that this law covers something beyond obscenity, and you pointed me to lewd. But I think you had a second point you wanted to make in response to that. I think you wanted to talk about the age variability standard. I did, yes. Would you make that – would you tell me about that? Yes. The age variable standard is unique to this law. It requires Hamburger Marys to make a case-by-case analysis of each minor who walks through its door, and then in real time tailor its shows to be appropriate for what the – for the youngest possible audience member. But the law gives no guidance on how to do that, and the State knows that this is not a reasonable ask. And the reason I know the State knows that is because in the State's petition for a re-hearing on bunk, they said it would be a virtually impossible task for the legislature to clearly define what kind of conduct is and is not appropriate for minors. I understand that argument. I understand why that's – you know, why that's a problem for your client. But I'm having a hard time connecting that argument to the idea that therefore this statute covers something beyond obscenity. That's the connection. It covers something beyond obscenity because if you have a 3-year-old, a 6-year-old, and a 16-year-old in the room, the performance has to be tailored to what is appropriate for the 3-year-old, which means the statute is restricting speech that is protected as to the 7-year-old and the 16-year-old. And that – it goes well beyond the Miller definition of obscenity. Yeah, but isn't that the same – I mean, can you make that same argument for a 17-year-old who's in a room with a 21-year-old, right? So if there's an obscenity statute that says that you can't have obscene material for someone who's under the age of 18, well, that means that if you've got someone under the age of 18 in there, you can't have the same show that you would have if they weren't under there. Yes, but in that situation, Hamburger Mary's can make a single choice. They can say, we're going to make all of our shows 18-plus or even 21-plus, and we're going to card at the door. And that is a reasonable statutory scheme for compliance because there's a really straightforward way that Hamburger Mary's – But isn't that exactly what Hamburger Mary's did here? It said, well, we know we could have a show that's for 16-year-olds or 15-year-olds or 14-year-olds, but we're not going to do that. We're just going to make it 18-plus, and we're going to card at the door. And Hamburger Mary's could still violate the law, even taking those steps. Because of the lack of an affirmative defense. Affirmative defense, and there's no guarantee that a minor under the age of 18 is even going to have an ID. When you were talking about the shows, I believe that have been canceled. You said that they were targeted for younger children, and they had a Disney theme and so forth. Doesn't that show that there is some sense of what's appropriate for a given age group and that maybe the 16-year-old wouldn't enjoy the Disney show, but the 3- and 4-year-old would? Can you translate that in a different context as well? Sure. I think that that says that there's – obviously, there's a general idea that a 5-year-old is going to enjoy a show that is Disney-themed. And that's what I mean when I say that those shows are targeted to be appropriate for very young children. You know, they keep – you know, innuendo and language is appropriate, and music choices would be appropriate for that age group. But that is very different – Hamburger Mary's making that kind of analysis on its own and offering a show to bring in, you know, families to its business. That is very different than making a case-by-case analysis where if they get it wrong, they've committed a crime. And so, I think that's the distinction there. Did I answer your question? Enough. Okay. One more question. One more question. This is fine. So, on the age variability standard, because like I said, I understand why that's sort of a practical problem for your client, but how is this different from a G rating, a PG-13 rating, an R rating, an NC-17 rating in the sense that, you know, we have sort of – in our lives, we have age variability all around us all the time for minors of different ages? I think the important distinction there, Your Honor, is that if a parent brings their child to an R-rated movie, the movie theater has not committed a crime. I think that's the distinction there. Okay. Okay. Thank you, Mr. Dewhurst. Thank you. Mr. Dewhurst, you've saved four minutes. Thank you, Your Honor. Just a few points. Counsel, can we pick up on that last point? Explain to me how the knowledge requirement works here, because we've talked a lot about this, the lack of an affirmative defense, but there's a very unique, I think both sides acknowledge, unique definition of knowledge or knowing, or knowingly. How does that work for the age verification here as an element that the state must prove in order for there to actually be an arguable prescribed here? Right. So, the knowingly, the age of the child, that's not an excuse under the Act, right? But the knowingly requires whoever the purveyor of the show is to understand the content and character of the Act, know it ahead of time, right, and to understand that it would actually meet the standards in the Act. It would constitute sexual conduct that passes through Miller or lewd activity that passes through Miller. So, obviously, that's a normal mens rea requirement that has to be proven. We have to show that the purveyor, in this case, if it's Hamburger Mary's or someone else, that they actually understood the content and character of the show on the front end. So, this is not a strict liability offense. Well, actually, there are two different knowingly parts to this. The other part is as to the kid's age, and there's a specific provision within the statute that says a person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a prosecution for a violation of this section. So, doesn't that mean that if you make a mistake, even though you used your best efforts to check for IDs, et cetera, and to screen out kids who weren't the right age, that you could still find yourself in jail? Well, it is written that way. Oh, yes. The answer is yes, right? Yeah, but I'm not sure, to Judge Newsom's point, whether that raises any constitutional difficulty. I think criminal statutes work like this routinely. This is a misdemeanor, right? Is this a misdemeanor?  Can I ask you a question to follow up, I think, on Judge Brasher's questions, the line of questionings that he was asking your adversary? Sure. I guess I take the age variability point to be, frankly, less about over-breath and more about vagueness. I think that the two terms in this case seem to me to have been hopelessly conflated by basically everybody. And, I mean, I take the plaintiff's point about vagueness, especially the kind of the strain of vagueness doctrine that is concerned about runaway discretion. It does seem a lot to ask of the proprietor, the bouncer, whomever, like, knowing the content of tonight's show, the age cutoff is going to be eight or something like that. And then the cop may disagree, the prosecutor may disagree. And, I guess, what do we do about, like, particularly precocious eight-year-olds? Yeah. Well, the good thing about this act is that it doesn't require an individualized assessment of the child. Well, for the age of the child present. That's right. I guess. But, I mean, like, is every eight-year-old the same? But it's based on the community's understanding about what would be appropriate for that age child. Okay. And you have parents who are taking their children to these shows on Sundays who are part of the community making that decision for their own family. So, are they considered in the community of interested people that, as you are defining it? Well, based on the complaint, there's nothing that would violate the act at those Sunday shows. So, absolutely not. But, as a parental consent is a good point, because I think the Brown court at the Supreme Court, the Brown case, they actually pointed out California's parental exception as a defect in the law and suggested that the state wasn't actually taking that serious of an attack minors from obscenity because they allowed the, you know, this parental exception. That's another defect we're trying to navigate. Let me ask you, going back to Judge Newsom's question. So, let's suppose that Hamburg Marys decides that the show is okay for anyone over 16. The state can then come in and say, no, it's 17 or it's 18, based on the discretion of the prosecutor. Is that correct? I think there are three different decision makers in the way that every obscenity law works. There's the private actor, there's the purveyor of the show, then there's a prosecutor or an enforcement authority, and then there's a jury. And it has to pass through all three of those, and they have to each make community… For an actual prosecution, but not for a chilling effect. I'm sorry? Not for a chilling effect. For a prosecution to succeed, you're correct. That's right. But for a chilling effect, Hamburg Marys has to say, well, we think the line might be 16, but gosh, the state could say it's 17 or 18. Well, the important point to remember, though, is if you do look at this as a pure vagueness challenge, separate from the First Amendment issues, then Hamburg Marys again fails on the standing standards that they have to actually plead to make that claim. Nowhere in their complaint do they suggest that they've ever let any kids attend their raceier shows. Never. They've never said that they might change their practice to make it differently age-gated. All they've said is that when it's not suitable for kids, they don't let kids attend. If I may, I think we've got your argument on standing. One question I had about the community standards is the statute defines it as statewide community standards, right? Do you think that in different communities, like perhaps, you know, I won't name communities, but there may be different communities that would think that different types of shows are appropriate for kids, right? So how is the statewide community standard identified? Well, the community standards and how the state prescribes those, whether it's locality or state or even, you know, national standards was sort of frowned upon by the Supreme Court for that reason. But statewide standards have routinely been upheld. And I guess the best way to leave it on that is to quote from the Supreme Court's case in Hambling, where they said that there may be marginal cases in which it's difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold that the language is ambiguous or too ambiguous to define a criminal offense. The Supreme Court has recognized that obscenity statutes are almost definitionally not always as precise as the judicial mind might appreciate, but this is how they work under the relevant doctrines. I just have a quick question, if I may, because I think you also challenged the injunction, which I don't believe we've talked about at all. So they're saying that the statute is overbroad. They're saying the injunction is overbroad. The Supreme Court, in denying your petition, recognized that these kinds of cases are unique and therefore passed on the opportunity to address the injunction. Can you just quickly speak on that? Yeah, I'm not sure we make much of the stay denial. As you know, Your Honor, the court decided CASA shortly afterward. And the one exception that they left open in that opinion, which was well-reasoned and lengthy, was the Administrative Procedures Act, which actually provides statutory mechanisms to vacate an agency action. And in those cases, universal relief might be appropriate. But there's nothing in the First Amendment doctrine or any other doctrine outside of those narrow examples that changes the fundamental equitable powers of the courts. Okay. Thank you, Mr. Dewhurst. I think we understand your argument. And we're going to allow Judge Choflat to leave us. And then we'll hear the second case. Thank you. Thank you so much. Who had this? He's getting old. Getting out very well. Can you imagine when you're 60 years old? No, I can't imagine when I'm 60 years old. This recently turned 64-year-old guy. I can tell you. It's better than the alternative. It is better than the alternative. I'm going to be 60 soon. I'm thinking to myself. We went to Vienna for my 60th birthday. Do something like that. We're going up to Maine for the summer. For me, that's my happy place. That's good. Just sit out there in front of the lake. It's nice to see and hear the water. I'm going to hit on a couple of questions. I know a couple of questions. He seems to come back and try to stay. He's kind of covered. He does. Well, I mean, a lot. But then I think there's the next question. The next question, which I think is very relevant. And again, for you and me. I feel like that first one, I'm going to be like. OK.